IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

## STATE OF TENNESSEE v. GEORGE E. RATLIFF

**Direct Appeal from the Criminal Court for Washington County**
**No. 23301     Lynn W. Brown, Judge**

**No. E2003-00830-CCA-R3-PC**
**June 15, 2004**

In 1998, the defendant, George E. Ratliff, was convicted of rape of a child, a Class A felony, for raping his six-year-old daughter and was sentenced to twenty-four years in the Department of Correction. He subsequently filed a direct appeal and a petition for writ of error coram nobis based on the victim's recantation of her testimony. The trial court summarily dismissed the petition as untimely, and the defendant appealed. The direct appeal and the error coram nobis appeal were consolidated, and this court reversed the trial court's dismissal of the petition, remanded the matter for a hearing, and stayed the direct appeal pending the trial court's ruling on the error coram nobis petition. See State v. Ratliff, 71 S.W.3d 291, 293 (Tenn. Crim. App. 2001), perm. to appeal denied (Tenn. 2002). On remand, the trial court denied the petition, and the defendant appeals. In his direct appeal, the defendant argues that the trial court erred in denying his motion for a new trial based upon newly discovered evidence, in denying his request for individual voir dire of two prospective jurors, and in ruling that the amount of time that lapsed between the victim's complaint and his arrest was irrelevant. Additionally, he argues that his sentence is excessive. Following our review, we affirm the defendant's conviction and sentence and affirm the trial court's denial of the petition for writ of error coram nobis.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); David F. Bautista, District Public Defender; and Jeffery C. Kelly and Deborah Huskins, Assistant District Public Defenders (at trial), for the appellant, George E. Ratliff.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Frank A. Harvey, Assistant District Attorney General Pro Tem, for the appellee, State of Tennessee.

# OPINION

## FACTS

### 1998 Trial – State's Proof

Dr. Martin E. Olsen, a licensed obstetrician and gynecologist, testified that he examined the victim, S.B.,[1] on October 31, 1996, after receiving a referral from the Department of Children's Services ("DCS"). His colposcopic examination of the victim's hymen revealed "a cleft at 6 o'clock . . . consistent with sexual abuse." Dr. Olsen explained that "something had to penetrate" the victim's vagina to cause the cleft. Asked if a fall could have caused the injury, Dr. Olsen said it would "have to be a fall where something penetrated the vagina. Just horseback riding or falling on a bike has different type of injuries to the female genitals." Dr. Olsen testified that this type of injury "[m]ost likely" would have caused pain to the victim and that it was inconsistent with the type of injury a child would do to herself.

On cross-examination, Dr. Olsen acknowledged that by using a colposcope to examine the victim, he was able to see things that he might not have seen with the naked eye. He also acknowledged that, when he received a referral from the DCS, he knew there had been an allegation of sexual abuse. Dr. Olsen said he had "never been presented with a patient with a hymenal injury from a non-sexual abuse act." He said he made his diagnosis based upon what the victim told him and his examination of her. The victim told him, "[D]addy touched me where he wasn't supposed to."

Rebecca Jones, the victim's mother, testified that the victim was born on August 12, 1989, and she and the defendant married in 1990. She said the victim did not have the defendant's last name because she and the defendant were not married at the time of the victim's birth and the defendant did not want her to have his name. During part of their marriage, she and the defendant lived in a building located beside his parents' house in Washington County. She and the defendant separated in October 1995, and she was given temporary custody of the victim and the defendant was granted visitation every other weekend. The victim's visitations with the defendant, including the visits in the summer of 1996, took place at the home of the defendant's parents where the defendant's sister and her two children also resided. During their divorce proceedings, Jones and the defendant had heated disagreements regarding custody of the victim. Their divorce became final in July 1997, and Jones was awarded custody of the victim.

Jones said that she reported the defendant to the authorities after the victim, who was walking "funny" and saying "she was hurting down there," returned from a visitation with the defendant and said she did not want to go back for any more visitations. Investigator Wiseman responded to Jones's call and came to her home to speak to the victim. Jones identified her signature on a

---

[1]It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

document dated September 14, 1996, authorizing Investigator Wiseman to record a telephone conversation between the victim and the defendant.

On cross-examination, Jones acknowledged that during their custody battle of the victim the defendant called her several times, saying that she was an unfit mother and had abandoned the victim. She acknowledged that she took the victim for a blood test to prove paternity, the results of which showed that the defendant was the victim's father. Jones acknowledged that the victim knew there were "bad feelings" between her and the defendant at the time of their divorce proceedings but denied that she ever talked to the victim about their custody dispute. Jones said she carried the victim to the emergency room in May 1996 when the victim returned from a visitation with the defendant and her "private was red." The victim also told Jones "what was going on." She said she initially took the victim to the DCS for an interview in May 1996.

Investigator Gary Wiseman of the Washington County Sheriff's Department testified that he first became involved in the case on September 14, 1996, when he went to the victim's home and talked briefly with her. The victim told him that the defendant had "touched her between her legs, or on her privates" inside the small building located on her grandparents' property. After obtaining Jones's consent to record a telephone conversation between the victim and the defendant, the victim had a brief conversation with the defendant. Wiseman said that, during the conversation, the victim became confused and asked him what she should ask the defendant. He acknowledged that he told her to ask if the defendant had touched her. He recalled the victim talking to the defendant about tickling her. He said that the defendant did not make any incriminating statements during the conversation. Wiseman went to the victim's grandparents' residence and saw the outbuilding that the victim had described to him. Wiseman spoke to Rita Parris of the DCS the following Monday morning.

Wiseman said he received the results of the victim's medical examination on November 6, 1996, and the defendant was charged with rape of a child in December. He explained that the defendant was not charged until December because he had determined that the victim was not in danger, he did not receive the results of the victim's medical examination until November, and he was also involved in a double homicide case in November. Wiseman acknowledged that he "[s]ometimes" had arrested sexual offenders on the day the allegation was made but said it depended on the individual case. He said he had reviewed the victim's May 24, 1996, and September 26, 1996, statements.

The victim, who was eight years old at the time of trial, testified that the defendant was her father and that after her parents separated, she lived with her mother and visited the defendant every other weekend at his parents' house. She said she initially enjoyed visiting with the defendant because she could play with her two cousins who also lived there. During her visits, she slept with her cousins inside her grandparents' house or with the defendant "out in that little building." She said that one night during the summer when she was sleeping in the bed with the defendant in the "little building," the defendant touched her between the legs. No one else was in the building at the time. She said she was wearing a t-shirt and panties, and the defendant was wearing shorts. The

victim said, "I was more like a little bit awake and a little bit asleep, and he put his hand in my private." She said the defendant touched her inside her panties and that it hurt "[a] little." Asked what she meant by "I felt [the defendant] touch me," the victim replied, "I felt him touch me but then when his hand came out . . . the elastic on my panties just came back and hit me." She did not say anything to the defendant when he touched her, but he told her if she ever told anyone what had happened he would kill her mother and her maternal grandmother. She said she knew the incident had happened in the summer because it was hot and she went swimming the next day with her aunt and cousins. She told her mother about the defendant's touching her "longer than two weeks" after it happened.

The victim said she was six years old when the incident occurred and that her birthday was in August. She said that Investigator Wiseman and other police officers came to her house the same day that she told her mother about the incident. She told mother about the abuse "like a day or two after" her school guidance counselor talked about good touches and bad touches. She knew her parents were getting a divorce at the time and that they were arguing about custody and said that she "felt caught in the middle of it." The victim denied that anyone told her to say that the defendant had abused her.

The victim said she remembered "a little" about going to the hospital to see a doctor because her private part was red and about talking to Rita Parris with the DCS. She recalled telling Parris that she had not seen the defendant naked and that the defendant tickled her. She acknowledged seeing a fight between her mother, her maternal grandmother, and the defendant at her aunt's house. The victim denied that she told Parris the incident had occurred inside her grandparents' house. She did not recall having an accident in the bathtub with a Barbie doll. Asked if she knew why she had gone to see Parris in May, the victim replied, "I know it was about what he did to me."

### 1998 Trial – Defense Proof

Douglas Carter, a practicing attorney for twenty-three years, testified that he represented Rebecca Jones in her divorce proceeding. He said that the defendant's attorney filed a divorce complaint on February 9, 1996, and a notice of hearing for temporary custody on July 30, 1996. Carter then filed an answer and counterclaim on behalf of Jones on December 9, 1996. At that time, he did not know Jones could not read and acknowledged that most of his communication with her was through letters. He said Jones did not miss any court appearances.

Cherie Morris, the defendant's sister, testified that, in the summer of 1996, she lived at her parents' house and the defendant lived in the apartment beside the house. The victim came for visitations with the defendant every other weekend. During her visits, the victim slept in the bedroom with Morris and her children; however, Morris recalled two occasions when the victim slept in the apartment with the defendant because the victim had head lice. One occasion was on July 24, but Morris could not remember the date of the other. Morris then related an incident that occurred in June 1996 when her daughters and the victim were playing with Barbie dolls in the bathtub. The victim was playing with the "leg parts" of the doll, and "she had it just a little ways in

her pee-pee." According to Morris, the victim had the foot of the doll inside "[t]he lips of [her] vaginal area." She said the victim told her she did not mean to do it and that she was just playing. She later told the defendant and the victim's mother about the Barbie doll incident.

Morris said that the defendant had always been honest and that she had been friends with Rebecca Jones. Asked about Jones's honesty, Morris said, "[I]t's hard to put it. . . . [Jones] would tell you things that wasn't really true, you know. She would tell you things that you knew weren't true, but, we just accepted her[.]"

Daisy Tuggle, Rebecca Jones's sister, testified that when Jones and the defendant separated, Jones and the victim came to live with her and acknowledged that custody of the victim became an issue. She said that Jones took the victim to see a doctor as a result of the victim touching herself but could not recall when Jones had taken her, except that it was before the "divorce and everything." Asked if she had an opinion about Jones's truthfulness, Tuggle replied, "I really don't know."

Sharon Kyker, the defendant's sister, testified that the victim's relationship with the defendant was "very close, and a very loving relationship. And, [the victim] was very attached to her daddy." She acknowledged there was a "very heated" custody battle between the defendant and Jones, and Jones expressed concern about being able to take care of the victim on her own and asked Kyker if she would consider taking custody of the victim. Jones told Kyker she would give Kyker custody of the victim but would never give the defendant custody. Kyker acknowledged that Jones could not read very well or drive at the time she discussed custody of the victim with her.

Kyker further testified regarding an incident in the summer when the defendant brought the victim to her because the victim "was crying and complaining of burning whenever she used the bathroom, when she peed." She explained that the defendant asked her to check the victim because she was a registered nurse. Kyker took the victim into a bedroom and asked her to show her "where it hurts." Kyker said the victim laid down and "kind of spread her straddle a little bit, and she was just red, I mean, bright red." She asked the victim if she "dr[ied] herself good" when she went to the bathroom, and the victim told her "not always." In Kyker's opinion, "that's what was making [the victim] hurt like that." She said the victim never said anything about the defendant touching her.

Shirley Ratliff, the defendant's mother, testified that the victim visited the defendant at her house every other weekend during the summer of 1996. She said that at the time the defendant lived in "like a little apartment" beside her house. When the victim visited, she slept in the bedroom with Mrs. Ratliff's other granddaughters except for two nights "sometime in July, or in August" when she slept in the apartment with the defendant because she had head lice. Mrs. Ratliff then related an incident in July when she carried the victim home and asked Jones to watch her because she was not wiping when she went to the bathroom and her private area was red. Jones then accused Mrs. Ratliff and her family of "trying to get everything" they could to use against her in the custody dispute.

The defendant testified that he is the victim's father and denied that he touched or threatened her. He said he filed for divorce from Jones in February 1996, and there was a custody dispute over the victim. During the summer of 1996, when the victim visited him every other weekend, she slept in the house with her two cousins except for two occasions when she slept in the defendant's apartment because she had head lice. He said the victim slept in the bed, and he slept in a reclining chair. He said that when the victim stayed in his apartment with him, she slept in a t-shirt and a pair of shorts. He said the victim lied when she testified that she slept in a t-shirt and panties. He also said the victim lied when she testified that he penetrated her with his finger and that she heard the elastic on her panties snap back when he took his hand out. He explained that the victim lied "[f]or her mother" and that the victim lied when she said no one had told her to say these things. The defendant said his mother told him about the redness in the victim's vaginal area, and he took the victim to his sister for her opinion as to whether the victim needed to go to the doctor. He acknowledged that he did not take the victim to the doctor at that time because he did not have any medical insurance on her. The defendant said he could not explain Dr. Olsen's testimony regarding the victim's torn hymen.

The defendant acknowledged that Jones could not read or drive and did not have a car at the time of their divorce and custody proceedings. He said that Jones told him in January 1996 that he and his family "could not take [the victim] from her, and she would do whatever she had to do to keep me from taking my child." The defendant said his attorney filed a motion in November for temporary custody of the victim because she had been abandoned. According to the defendant, Jones, her mother, and her current husband had "masterminded this whole plot against [him]," and Jones had manipulated the victim into saying that he abused her.

Rita Parris, a social worker for the DCS, testified that a complaint alleging that the victim had been sexually abused by her father was filed on May 20, 1996. Parris said that the details of the complaint were as follows:

> [The victim] visits her father every other weekend. Her father lives at [his] parents' home, and an aunt and two young cousins live there also. . . . Last night referral source claimed [the victim] returned from a visit and her private area was red. [The victim] told referral source that when she visits her father she sees dirty movies. She's seen her daddy naked a lot. She's always naked and her father and grandfather come into the bathroom when she's naked. Referral source said [the victim] is usually protective of her father, and this is the first time she has said anything like this. Referral source said, suspected abuse before because when she picked the child up she was often naked.

Parris said she interviewed the victim on May 24, 1996, and no action was taken by the DCS following that interview.

Parris interviewed the victim again on September 26, 1996, and the victim told her that the defendant had touched her "in the wrong place" with his hand. She asked the victim if the defendant had stuck his finger inside her private, and the victim responded affirmatively. Referring to a transcript of the interview, Parris said that in response to a question about how many times the defendant had touched her, the victim responded, "[I]t happened nine times in one night." She asked the victim how she knew it happened nine times, and the victim, referring to the elastic on her panties, said, "because I could feel the flat part hit me and hit me." The victim told Parris that she was six years old when the defendant abused her and that it occurred in the summer because she went swimming the next day. Parris said that the victim was consistent in her statements that the defendant was the one who had abused her. The victim was referred to Dr. Olsen for an examination, which was scheduled for October 31, 1996. She received a copy of Dr. Olsen's report in early November which stated that the victim had a penetrating injury consistent with sexual abuse.

Recalled by the defense, Sharon Kyker testified that she was certain she did not take the victim swimming during the summer of 1996. She did recall an occasion before the summer of 1996 when the victim and Rebecca Jones went swimming with her and her children.

**Sentencing Hearing**

Several character witnesses testified on the behalf of the defendant. Sharon Kyker testified that the defendant was a truthful person and that he had "been as much a father to [her] children as their own fathers ha[d]." Shirley Ratliff, the defendant's mother, testified the defendant had always been truthful with her, and it was "unfair" that he was in this position. Cecil Ratliff, the defendant's brother, testified that he believed the defendant was innocent and that his conviction was "a miscarriage of justice if there ever was one." Debbie Sharp, a friend of the defendant's family, testified that she had known the defendant for about three years, that he was a truthful person, and that she would trust him around her child. Calvin Kyker, the defendant's ex-brother-in-law, testified that he had known the defendant all of his life and that the defendant had always been honest. He said the defendant's conviction was "a big joke," and the court was "sending a man that don't [sic] need to go to prison to prison."

Raymond Tim Potter testified that he had known the defendant for five or six years and that the defendant had worked for him at Johnson City Chemical. He said the defendant had always been "very truthful" with him, and he believed the defendant was innocent. Potter admitted that he had not heard the victim's testimony and was unaware of the victim's medical proof.

Cody Minns, the defendant's nephew, testified that the defendant was "a good honest person, and he's innocent." Amanda Kyker testified that she was thirteen years old and had been around the defendant all of her life. She said the defendant was a nice person and did not believe he would "do something like that." April Minns, the defendant's niece, testified that the defendant was her "best friend in the whole world." She described the defendant as an honest person and said he had never done anything inappropriate to her.

## 2003 Error Coram Nobis Hearing

At the March 10, 2003, hearing, the victim, S.B., testified that she was thirteen years old and was currently living with her mother. She said she and the defendant had corresponded with each other, but she had not had any contact with him for the past two and one-half years because her paternal grandparents told her not to. Asked if she knew why the defendant was in prison, the victim replied, "Because I said that he did something to me that he didn't do." She said the defendant did not sexually abuse her and did not put his finger in her vagina when she was six years old. She had gotten the idea to say that the defendant abused her after hearing her school counselor talk about good touches and bad touches. She did not know at the time of the defendant's trial that he would be incarcerated. Asked why she would have lied about the defendant, the victim replied, "Because . . . they [her parents] were arguing. I didn't know what to do. I figured maybe they would stop if I said something like that. I didn't actually know what it meant." The victim said she did not know how she sustained the vaginal injury, and she "might have" put the leg of a Barbie doll inside her "when [she] was little." She said she did not remember much about her trial testimony. She denied that the defendant had ever threatened to kill her mother or anyone else. Asked why she testified at trial that the defendant had made these threats, the victim replied, "I don't remember why I said it. . . . I might have heard it somewhere and didn't really kn[o]w what it meant."

The victim said that she first told her mother "a little bit after the trial" that she had testified untruthfully "[b]ecause it was hurting me so bad that I had done something, and . . . I had said something and it wasn't true, and I needed to get it off my conscious [sic]." She said she first had contact with the defendant's family about "a year or two after the trial" when she visited her grandmother. During that visit, there was no discussion about the defendant's trial or his incarceration. During her next visit with her grandmother "a couple of weeks, or a month" later, her aunt and cousin were also present. The victim said she started crying and told her aunt that she had lied and asked her what she should do. She told her aunt that she had told her mother, and her aunt said she would talk to her mother about it. She said at the time she was living with her maternal grandmother but denied there had been any discussion about her living with her paternal grandparents. She said she had visited with her paternal grandparents every other weekend until they were told "that it was best for them not to have any contact" with her. Her paternal grandparents did not discuss the trial during her visits, but they did tell her the defendant loved and missed her.

Her first contact with the defendant occurred when she wrote him a letter because she "started missing him a lot." In her letter, she told the defendant that she loved him but did not tell him that she lied at trial because she "was kind of afraid to." Five letters that the victim wrote to the defendant, two of which were dated February 6, 2000, and February 27, 2000, as well as two letters that the defendant wrote to the victim dated February 29, 2000, and April 9, 2000, were then admitted into evidence. The victim said she thought she wrote the letters to the defendant while at her grandparents' house and that her grandmother had given her the defendant's address. She also talked to the defendant twice by telephone while at her grandmother's house. She said the conversations were short, she told the defendant she loved and missed him, and he told her the same. She said they did not discuss the trial or talk about her recanting her testimony.

-8-

The victim acknowledged that she went with her mother to trial counsel's office in November 1999 and told counsel that she had testified untruthfully at trial. She remembered telling counsel that the defendant "hadn't done it." About a week later, she met with an assistant district attorney general who asked her if her trial testimony had been truthful. Asked if she told the prosecutor that her trial testimony had been truthful, the victim replied, "I might have. . . . Because I didn't know which part of my trial she was talking about. She never actually said anything about what part." Asked if the assistant district attorney indicated to her that she would be in trouble for being untruthful, the victim said, "The way it sounded she kept saying, like I could get in trouble that – for lying in court, and that I could get sent off, or something." She said she visited her paternal grandparents "[a] couple of times or more" after her interview with the prosecutor but denied that they discussed the interview.

On cross-examination, the victim said she remembered telling the jury at trial about the defendant molesting her and said she did not change her story at trial because she was afraid to and did not know "how to stop anything." She said she did not know that the trial "was that serious," and she "was afraid to say that it didn't happen." In response to a question from the trial court as to what she had been afraid of, the victim replied, "I was afraid that I was going to get taken from my mom." She remembered telling an investigator that her parents were fighting all of the time and that she thought by accusing the defendant of rape they would stop fighting. The victim acknowledged being questioned by Shirley Odom of the DCS about three or four months prior to the hearing "because someone had called in, and said [her] mom's boyfriend had done something to [her]."

Shirley Odom, a protective services investigator with the DCS, testified that in October 2002 she met with an assistant district attorney general regarding possible sexual abuse against the victim. Odom said she had received a referral that the victim had been sexually abused by her mother's boyfriend, Ronnie Hopson. Odom asked the victim if she had ever been sexually abused, and the victim told her another of her mother's boyfriends, Harry Cole, had touched her breast underneath her clothing the previous year. The victim denied that Hopson or anyone else had touched her.

Rebecca Jones, the victim's mother, testified that the victim told her "right before Thanksgiving"[2] that the defendant had not sexually abused her. According to Jones, the victim "started crying, and said that she lied on [the defendant], and that he didn't do nothing [sic] to her." The victim first told the defendant's sister that she had lied and then told Jones about an hour later. Jones said the victim had been to the home of the defendant's parents "[m]aybe twice" before she recanted. She subsequently took the victim to the district attorney general's office where she was interviewed by Janet Hardin. Jones said the victim never told her she was being pressured by the defendant's family to recant, and she never told the victim what to say, only "to tell the truth, and nothing but the truth." Jones did not know why the victim had changed her story and acknowledged that she was not privy to any of the conversations that the defendant's family had with the victim during the victim's visits with them.

---

[2]Jones said she thought this occurred in November 1999.

Attorney Janie Lindamood testified that she had been appointed by the Johnson City Juvenile Court as guardian ad litem for the victim and had filed a claim under the Criminal Injuries Compensation Fund for the victim. Referring to a copy of the claim which was admitted into evidence, Lindamood said that the victim had been taken to the Johnson City Medical Center on June 3, 1996, and that the medical report did not indicate any sexual abuse although it referred to the victim having pain and itching in the vaginal area. The victim's compensation claim was subsequently denied because she recanted her statement and the emergency room treatment notes did not "fully substantiate the findings that sexual abuse occurred." Lindamood said she did not include the victim's medical records concerning the finding by another doctor of sexual abuse because those records were not provided to her.

Sharon Kyker, the defendant's sister, testified that the first contact she had with the victim after the defendant's trial was in October or November 1999. The victim or Rebecca Jones initiated the contact. During a shopping trip with Kyker, Kyker's daughter, and the victim's paternal grandmother, the victim started crying and told Kyker that she had done "something bad" and had lied about the defendant. Asked by the trial court about her response to the victim, Kyker replied, "I was concerned, you know. And I felt good because . . . I never believed it transpired to begin with, so, I was pleased that she lied. But, I mean, where do you go? I don't know. I didn't have anything to tell her." She did not tell the victim to talk to law enforcement officials or to the DCS. The victim visited her paternal grandmother "every couple of months" until August 2001. She said the victim had spent the night in her home "maybe three times," but she never discussed the trial or talked about the defendant with the victim. On cross-examination, Kyker acknowledged that the defendant's family thought the defendant had been wrongly convicted and that there was much talk among family members after the defendant's trial.

Shirley Ratliff, the defendant's mother, testified that her first contact with the victim after the defendant's trial was in September 1999 when the victim and her mother came to her home for a visit. Thereafter, she saw the victim about every other weekend, but she did not discuss the trial or the defendant with the victim during those visits. She said the defendant spoke to the victim by telephone on three occasions when the victim was visiting at her house. She said the victim received a birthday card and a Christmas card from the defendant. Mrs. Ratliff said the victim sent letters to the defendant, and the victim probably got the defendant's address from her house. Mrs. Ratliff acknowledged that the defendant sent his letters to the victim to her house, instead of the victim's house, because he did not know where the victim lived. Her contact with the victim ended about two years prior to the hearing because she was told not to have any contact with the victim.

Assistant District Attorney General Janet Hardin testified that she became involved in the defendant's case after the victim talked to trial counsel and counsel filed the error coram nobis petition. She met with the victim and her mother and discussed whether the victim had lied during the trial. The victim denied that she tried to tell anyone during the trial that she had made up the allegation of sexual abuse. As to her interview with the victim, Hardin said:

And I asked her specifically is what you said at trial the truth, and she said yes. And I said is what you're telling me here today the truth, and she said yes. And I got no feeling, or indication either verbal or – or any other kind of mannerism about her that anything that she told me that day wasn't the truth. And I didn't specifically confront her about the difference. What I did was I asked her if she had contact with [the defendant]. And the reason I asked that question was because of the dynamics between what I saw then with her, and her mother. And she said that she had contact with [the defendant] through her grandparents. That, . . . she talked to him on the phone. She'd received presents and money. And I'm unclear as to whether he sent them, or whether the grandparents gave them to her. I – I don't know that. And I didn't try to p[i]n her down because it became clear to me that she had contact with her father, and in my mind this explained the influence that I believe – explained what had happened.

Asked if she and the victim discussed what the victim told defense counsel, Hardin said:

I didn't want to give the appearance to her that what she said to [trial counsel] wasn't the truth. I wanted to know what the truth was even if it wasn't what she was telling me. If what she told [trial counsel] was the truth then that was fine in the sense that I . . . wanted to know it. And she recognized the difference, and . . . told me that what she'd told at trial was the truth, and what she was telling me had happened . . ., and that's what she was telling me there today. And . . . I did ask her, you know, do you know why you're doing this, and she would shrug her shoulders. I . . . didn't get a definitive answer, and I really didn't expect one.

Hardin could not remember if the victim's mother had been present during the entire interview but remembered that "at the end she was there because she was asking me questions." She said the interview was not tape-recorded, and she did not take notes because she thought the victim/witness coordinator was doing so. She did not "get into the details of the abuse" with the victim, but it was clear to both of them that they were discussing the sexual abuse. She told the victim that she knew the victim had told trial counsel "something different."

Lisa Rice, a former assistant district attorney general, testified that she was the prosecutor at the defendant's trial and that she met with the victim two or three times prior to trial. She said Dr. Olsen's medical examination of the victim was consistent with what the victim said had happened. The victim's testimony at trial was also consistent with her prior statements. Rice said the victim "described some sort of building outside the main home of [the defendant's] family where [the defendant] was staying and sleeping. And [the victim] was out there with him, and she described

-11-

. . . the events that was consistent with the physical proof that Dr. Olsen presented to us." Hardin said she did not remember talking to the victim after the trial and did not remember if she or her mother came to the sentencing hearing. She did not recall the victim or anyone else approaching her after the trial and saying the victim needed to change anything she had said.

Asked about one of the victim's prior statements given to Rita Parris at the DCS, Rice said she did not recall that specific statement. In that statement, the victim said she had never gotten a "bad touch" and that no one had ever touched her in her private parts. Rice said she was certain that she would have asked the victim about good touches and bad touches and that she would have discussed the victim's responses with the DCS representative. Rice explained that the victim never told her that the incident with the defendant did not happen or that the defendant did not do it. The victim also never told her that she had made up the story. The victim was always consistent that the defendant had put his hand underneath her underwear. The victim never indicated to Rice that she was lying. Rice said that although the victim was "a quiet child" and "perhaps a little more timid than your average seven or eight year old," the victim was "detailed enough and specific enough that [she] felt comfortable in putting the case in front of a jury."

At the conclusion of the hearing, the trial court denied the petition and discussed the difference between the victim's credibility at trial and at the hearing:

> This court vividly recalls the testimony of [the victim] at trial. I remembered it before we started this hearing. I looked through my notes. I . . . remembered it even better having read her transcript. At . . . the jury trial she was precocious. She was intelligent. She . . . answered questions very responsively . . . . Now, we're almost seven years after the event. But, her creditability [sic] in [the] proceedings today was just not nearly as good. When she testified in this . . . court at trial she was one of the most believable, unshakable, confident witnesses that this court has seen in a case of this nature. Her creditability [sic] was extremely high. Her creditability [sic] today just didn't cut it. She shows no emotion. She cannot explain various things in her testimony in the past, why she would have said that [the defendant] said that he would kill her mother, and . . . her grandmother. . . . Considering her demeanor, and the interesting thing that the first time she recants is . . . immediately upon her first visit to [the defendant's] family. Most suspicious! If her creditability [sic] at trial had been as poor as it was in this courtroom today [the defendant] would not have been convicted. But, her creditability [sic], her testimony at trial to this court was believable, creditable [sic]. The court finds so, and the court does not accredit her testimony here today.

## ANALYSIS

### I. Newly Discovered Evidence

The defendant argues that the trial court erred in denying his motion for a new trial based upon newly discovered evidence. This evidence consisted of twelve pages of the victim's medical records, and particularly that dated June 3, 1996, wherein the treating physician noted that the victim's complaint was vaginal burning and itching, that the victim's nine-year-old cousin had "showed her how to play with herself," and that "[t]here was thought to possibly be a whitish substance inside the hymenal ring, but that could not be confirmed using a Q-tip."

As to this evidence, the defendant argues on appeal:

> The statement contained in the medical report that [the victim] had been shown "how to play with herself," would have been extremely material to the defense in arguing that the cleft to [the victim's] hymen was caused by her own actions, and not by [the defendant].
>
> This is also critical because the State used the expert medical testimony of Dr. Ols[e]n to bolster the credibility and scant testimony of [the victim] that [the defendant]: "touched me between the legs." Since Dr. Ols[e]n testified that the cleft to the hymen was caused by some type of penetration, this new evidence lends substance and credibility to [the defendant's] contention that [the victim] herself caused the penetrating injury.

When a defendant seeks a new trial based on newly discovered evidence, he must show (1) reasonable diligence in seeking the newly discovered evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Whether or not to grant a new trial based on newly discovered evidence, however, lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 220 Tenn. 383, 417 S.W.2d 774, 778 (1967)). We review this issue, therefore, for an abuse of discretion.

At the hearing on the motion for a new trial, trial counsel made an oral motion to amend his written motion to include the newly discovered evidence, which the trial court granted. Regarding the victim's June 1996 medical records, trial counsel stated, "[T]his issue came up in the course of [the defendant's] trial that, in fact, [the victim] had a month or so prior to the allegation had gone to the Johnson City Medical Center and they had performed an examination. I wasn't aware of this at the time." The prosecutor responded:

-13-

[A]ll I can say is that when [trial counsel] first raised the issue I went through our file, and those records were not in the file. So, for any . . . claim that, you know, they were not furnished exculpatory evidence based upon what was in the file when I got it they weren't in there. They weren't in our possession, so, they were not there to . . . give in the point of exculpatory evidence."

The trial court concluded that the new evidence, relied upon by the defendant, would not have altered the jury verdict and, thus, did not entitle the defendant to a new trial:

But, there is . . . nothing in here that directly contradicts any of the testimony of these witnesses. As far as [newly] discovered evidence is . . . concerned it doesn't rise to the level that . . . cause [sic] into question any jury verdict, or, that the court's own conclusion. Therefore, the grounds of the newly discovered evidence is also respectfully denied.

"When it appears that the newly discovered evidence can have no other effect than to 'discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness,' the trial court should not order a new trial 'unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing that a different result at trial would necessarily follow.'" State v. Caldwell, 977 S.W.2d 110, 117 (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)). We agree with the trial court that the newly discovered evidence in this case, consisting of the physician's notation that the victim's nine-year-old cousin had "showed her how to play with herself," was not of such materiality that it would have changed the outcome of the trial.

We conclude that the trial court did not abuse its discretion in denying the defendant's motion for a new trial based on newly discovered evidence.

## II. Individual Voir Dire

The defendant next argues that the trial court erred in denying his request for individual voir dire of two prospective jurors who indicated they had been involved in a case of a sexual nature. The State argues that this issue has been waived because the defendant never filed a motion requesting individual voir dire.

The purpose of voir dire is to ensure that jurors seated at trial are competent, unbiased, and impartial. See State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997). The trial court is granted broad discretion in deciding the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. See State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002) (citing State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994)),

-14-

cert. denied, 538 U.S. 1001, 123 S. Ct. 1899, 155 L. Ed. 2d 829 (2003).  We review the defendant's issue, therefore, under an abuse of discretion standard.

Rule 24(a) of the Tennessee Rules of Criminal Procedure states:

> The court shall cause the prospective jurors to be sworn or affirmed to answer truthfully the questions they will be asked during the selection process, identify the parties and their counsel, and briefly outline the nature of the case.  The court may put to the respective jurors appropriate questions regarding their qualifications to serve as jurors in the case and shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges.  The court, upon motion of a party or on its own motion, *may* direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

Tenn. R. Crim. P. 24(a) (emphasis added).  Further, "[t]he prevailing practice in this state is to examine the jurors collectively rather than individually." State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991).  Individual voir dire, however, is mandatory when there is a significant chance that a prospective juror has been exposed to potentially prejudicial material.  Id.; see also State v. Shepherd, 862 S.W.2d 557, 568 (Tenn. Crim. App. 1992) (noting that at least nine of the members of the jury had seen an "Unsolved Mysteries" television program about the defendant, and ten of the jurors were aware that the defendant was charged with more than one murder).

During the voir dire, two prospective jurors apparently signaled affirmative responses to trial counsel's question, "Anyone who has been involved in, themselves, a family member, or a close personal friend been involved in a sexual case?"  After the trial court denied the defense request for individual questioning of these jurors, the first told, as her complete description of the experience, of "one incident, but, it was over a period of five years."  She then said that "it would not" in response to the question whether "it would be difficult for you to sit and hear the proof in this case."  The second prospective juror said, as his complete description of the "sexual case," that "[i]t was a family member."  He responded "[a]bsolutely" when asked if he could "give both sides a fair trial."

The defense argues on appeal that the questioning of these prospective jurors in the presence of the others "exposed the entire jury panel to this prejudicial information."  However, the fact that sexual abuse occurs would not appear to be new information to anyone; and, the claim is highly speculative that the other jurors were so tainted as to require a new trial simply because they heard two prospective jurors briefly state they had prior involvement with some type of sexual claim.  We conclude that the trial court did not abuse its discretion in denying individual voir dire of these two prospective jurors.

### III. Lapse of Time Between Victim's Complaint and Defendant's Arrest

The defendant argues the trial court erred when it ruled, in the presence of the jury, that the amount of time that lapsed between the victim's complaint and his arrest was irrelevant. He contends that the court's ruling denied him "the opportunity to explore any doubts of [his] guilt on the part of the Investigator [Gary Wiseman]."

The defendant's first question to Wiseman was, in part, "[W]hy did it take three months to arrest[?]"[3] Wiseman explained that he did not receive the victim's medical report until November and that he was working on a double homicide case at the time. Other questions included whether, even in cases where the only proof was "the child making the allegation," Investigator Wiseman would "arrest [the suspect] on the day of the allegation." Wiseman said he did not "get in a hurry to arrest, unless, there is a danger to the child; unless, everything just fits at the time; or, unless I get a confession." After Wiseman responded to a question that, as to arresting a suspect, "patience is a little better in some cases," counsel then asked, "Some cases when you're not sure about them. When you need more evidence, correct?" Wiseman answered, "Well, no," and then explained that some child abuse cases never go to trial because "it's too hard on the child" or there is not enough evidence to get a conviction. It was shortly after this question and answer that the trial court made the "observation" that "[t]he amount of time it takes to arrest somebody has nothing to do with this case. . . . We're off on something again that is completely irrelevant," and we note that this statement by the trial court came ten pages, according to the trial transcript, into the cross-examination of Investigator Wiseman.

At the conclusion of Wiseman's testimony, trial counsel moved for a mistrial based upon the court's comments concerning the irrelevancy of the timing of the defendant's arrest. In denying the motion, the court said, "It's absolutely not relevant. . . . [W]hat the officer feels, what the officer thinks is not at issue period. Motion for a mistrial respectfully denied. There is no showing of a manifest necessity."

The defendant's central argument as to this claim is that he was entitled to determine Investigator Wiseman's opinion as to the credibility of the victim: "If the investigating police officer in a child sexual abuse case, who has access to all of the evidence, has doubts about a defendant's guilt, this must conveyed to the jury since it goes to the central issue of whether the crime was committed."

We respectfully disagree with this position. In fact, counsel may not elicit the opinion of a witness as to whether the witness believes the defendant to be guilty, which is what the defense was attempting to do by implication in eliciting a statement from Wiseman that he did not believe the victim. See State v. Thompson, 950 P.2d 977, 980 (Wash. Ct. App. 1998) ("It is well settled that a witness, whether lay or expert, may not give an opinion as to the defendant's guilt, whether by

---

[3] By this question, he was referring to the lapse of three months between the September 14, 1996, complaint of the victim and the December 12, 1996, arrest of the defendant.

direct statements or inferences."); State v. Cruz, 894 P.2d 573, 575 (Wash. Ct. App. 1995) ("The evil sought to be avoided by prohibiting a witness from expressing an opinion as to the defendant's guilt or innocence is having that witness tell the jury what result to reach.").  Accordingly, the trial court properly terminated the defense's continuing line of improper questioning by saying the questions were irrelevant.  This issue is without merit.

## IV.  Sentencing

As his final issue on direct appeal, the defendant argues that his twenty-four-year sentence is excessive and the trial court erred in its application of the enhancement and mitigating factors.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."  Tenn. Code Ann. § 40-35-401(d).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts.  State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).  However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

The trial court conducted a lengthy sentencing hearing in this matter, reciting that in making its determinations, the court would consider the principles of sentencing, the presentence report, evidence from the trial and sentencing hearing, the enhancement and mitigating factors to be applied, and arguments of counsel.  Accordingly, our review of the trial court's sentencing determinations is *de novo*.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.  In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

In setting the defendant's sentence at twenty-four years, the trial court applied enhancement factor (16), "[t]he defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense," Tenn. Code Ann. § 40-35-114(16), and gave it "an extraordinary amount of weight." The defendant concedes that the trial court was correct in applying this factor but argues that it "erred in placing such great weight and emphasis upon this factor."

As to mitigation, the defendant argues that the trial court erred in not considering his good character. At the sentencing hearing, the defendant presented a number of witnesses, all of whom testified as to his honesty and good character. In declining to apply this factor, the trial court stated that the defendant was "not a person of good character, but, that he lied even after the trial when he gave his . . . statement to the probation officer. He's in complete denial." The defendant further argues that the trial court should have given more weight in mitigation to his lack of a prior criminal record and to the level of cooperation he showed after being accused of the crime. Regarding these two factors, the court stated: "So, if you consider all this together the court is of the opinion that there is some mitigation shown in giving him every benefit of the doubt."

In his brief, the defendant also argues that the trial court should have applied mitigating factor (1), his "criminal conduct neither caused nor threatened serious bodily injury," Tenn. Code Ann. § 40-35-113(1), although defense counsel did not argue at the sentencing hearing that this factor should be applied. He contends "there was no proof that [the victim] suffered a serious bodily injury" because the allegation involved only one occasion of digital penetration.

There is no mathematical formula of evaluating the enhancement factors to calculate the appropriate sentence. See generally State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76 (citations omitted). We conclude that the record supports the substantial weight given by the trial court to the enhancement factor that the defendant abused his position of trust and in giving little or no weight to the mitigating factors of lack of a prior criminal record, good character, and his cooperation following the accusation, as argued at the hearing. As to the claim presented for the first time on appeal that the court should have applied, as well, the mitigating factor that he did not cause or threaten the victim with serious bodily injury, we conclude that, even if applied, as in State v. Hayes, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995), this factor would have been entitled to little weight and would not have altered the sentence. Accordingly, we conclude that the trial court did not err in its application of the enhancement and mitigating factors and that the defendant's sentence of twenty-four years is not excessive.

### V. Petition for Writ of Error Coram Nobis

The defendant argues that the trial court erred in denying his petition for writ of error coram nobis based upon the victim's recantation, saying that the victim's testimony at trial was "fraught with inconsistencies, failed memory, and of any detail."

A writ of error coram nobis is an extraordinary remedy by which the trial court may provide relief from a judgment under narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). The remedy is available by statute to a criminal defendant in Tennessee. See Tenn. Code Ann. § 40-26-105. This statute provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Id. Recanted testimony may qualify as newly discovered evidence. Mixon, 983 S.W.2d at 672. A new trial should be granted on the basis of newly discovered recanted testimony, however, only if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n.17 (citations omitted). The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). As such, we will not overturn the decision of the trial court in this case absent a showing of abuse of discretion.

At the hearing, the trial court stated that "five years ago [the victim] was one of the best witnesses this court has ever seen" and that "she was one of the most believable, unshakable, confident witnesses that this court has seen in a case of this nature. Her creditability [sic] was extremely high. Her creditability [sic] today just didn't cut it." The court concluded that coram nobis relief would not be granted to the defendant:

> A writ of error coram nobis is an extraordinary remedy by which [a] trial court may provide relief from a judgment under narrow and limited circumstances. And, of course, the State versus Mixon case that the prosecution has referred to, Tennessee Supreme Court, 1999, basically, gave a new lease on life to the old remedy of writ of error

coram nobis. So, the first factor if it involves recanted testimony, which can be considered newly discovered evidence; and this certainly was not available to you at the time of the trial, and could not have been discovered. So, there's no lack of diligence there. But, the trial court must be reasonably well satisfied that the testimony given by a material witness was false at the trial, and the new testimony of recantation is true. The court concludes the other, to the contrary. That the testimony given by [the victim] at trial was in fact the truth, and not so here today. That being the case the petition for writ of error coram nobis is respectfully denied.

We note that, prior to the victim's testifying at the trial, the court had questioned her at length as to the need to be truthful in her testimony, determining that she understood the nature and significance of taking an oath and was competent to testify:

Q       How old are you?

A       Eight.

Q       Do you go to school?

A       Yeah.

Q       Where do you go to school?

A       Cherokee.

Q       And, what are you studying at Cherokee?

A       Uhm, we're taking our T-Caps tests last week.

Q       What's a T-Cap?

A       It's where they – if you take it – on what you've learned that year.

Q       What grade are you in?

A       First.

Q       Are you looking forward to school being out?

        (No audible response)

-20-

Q       Okay.  Do you understand what it meant when I asked you to raise your right hand and – and ask you a question?

        (No audible response)

Q       You're nodding yes.  Can you answer, please?

A       Uh-um.

Q       These are . . .

A       Not really.

Q       Do you go to church or Sunday School?

A       Yeah.

Q       What do they teach you at church or Sunday School?

A       About Jesus.

Q       Do you understand that when you answered that question, do you solemnly swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, . . . so, help you God, when I asked that and you said, – you nodded yes, is that right?

A       Yes.

Q       Do you understand that . . . when you answered that that you were promising this court, and that you were promising Jesus that you were going to tell the truth?

A       Uh-um.

Q       You understand that now?

A       Yes.  Yes, sir.

Q       And, is that what you're going to do?

A       Yes.

THE COURT: The court finds that she understands the nature and the significance of the oath, and is competent to testify.

We have carefully reviewed and compared the victim's testimony at the trial and the coram nobis hearing. We note, as did the trial court, that her trial testimony of the defendant's abuse was detailed and unhesitating. By contrast, at the hearing, she responded, "I don't know" to varied questions such as why she did not "just tell the truth at the trial;" why she did not think her trial testimony was "serious;" why she was afraid she would be taken from her mother if she did not testify as she did at the trial; and why she thought she would be taken from her mother if she did not testify that the defendant had molested her. Thus, based upon our review of the record, we cannot conclude that the trial court abused its discretion in finding that the victim's testimony at the trial had been truthful and denying relief to the defendant.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the defendant's conviction and sentence and affirm the trial court's denial of his petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE

-22-